**RECORD NO. 15-2391**

# United States Court of Appeals
### For The Fourth Circuit

## FIRST PROFESSIONALS INSURANCE COMPANY,

*Plaintiff – Appellee*,

**v.**

## KYRSTEN E. SUTTON, M.D.,

*Defendant and 3rd-Party Plaintiff – Appellant*,

**and**

## AMY MOORE, As Parent and Guardian ad Litem for N. M., a minor; RICHARD MOORE, As Parent and Guardian ad Litem for N. M., a minor,

*Intervenors/Defendants,*

**v.**

## THE MEDICAL PROTECTIVE COMPANY,

*Third Party Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA AT CHARLESTON

―――――――――

## BRIEF OF APPELLEE

―――――――――

Thomas C. Salane
R. Hawthorne Barrett
TURNER, PADGET, GRAHAM & LANEY, P.A.
Post Office Box 1473
Columbia, South Carolina 29202
(803) 254-2200

*Counsel for Appellee*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS</u>
## <u>AND OTHER INTERESTS</u>

<u>No</u>: 15-2391          <u>Caption</u>: First Professionals Insurance v. Krysten Sutton


Pursuant to FRAP 26.1 and Local Rule 26.1, **FIRST PROFESSIONALS INSURANCE COMPANY**, which is the **APPELLEE**, makes the following disclosure:

1.  Is party/amicus a publicly held corporation other publicly held entity?  **NO**

2.  Does party/amicus have any parent corporations?  **NO**

3.  Is 10% of more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  **NO**

If yes, identify all such owners: **N/A**

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? **NO**

5.  Is party a trade association?  **NO**

6.  Does this case arise out of a bankruptcy proceeding?  **NO**

# **TABLE OF CONTENTS**

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS
AND OTHER INTERESTS ..................................................................i

TABLE OF CONTENTS...................................................................... ii

TABLE OF AUTHORITIES ..............................................................iv

STATEMENT OF THE ISSUES............................................................1

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE...............................................................2

      A.    Facts of the Underlying Case .................................................2

      B.    The Underlying Lawsuit.........................................................3

      C.    The Records Review Letter ....................................................4

      D.    Sutton's FirstPro Policy Application ....................................6

      E.    The FirstPro Policy...............................................................7

      F.    The Original Proceedings Below ..........................................9

      G.    The First Appeal..................................................................11

      H.    Proceedings Below On Remand...........................................12

SUMMARY OF ARGUMENT ............................................................13

ARGUMENT ......................................................................................14

      I.    Standard of Review .............................................................14

II.    Exclusion 11(c) is applicable because the facts, circumstances and inferences surrounding the Letter made a potential claim by Amy and/or Nathan Moore reasonably foreseeable............................15

    A.    Exclusion 11(c) ........................................................................16

    B.    FirstPro Application................................................................17

    C.    The record supports the district court's finding that a potential claim was reasonably foreseeable to Sutton when she completed the FirstPro application ...........................18

    D.    The district court properly concluded that Exclusion 11(c) is applicable ..................................................................26

III.    The district court correctly concluded that no expert testimony was necessary to establish objective reasonableness in this context .......................................................................................37

CONCLUSION ........................................................................................43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Special Risk Mgmt. Corp. v. Cahow,*
    192 P.3d 614 (Kan. 2008).................................................................18

*Anderson v. Bessemer City,*
    470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ..............................15

*Bennun v. Rutgers State Univ.,*
    941 F.2d 154 (3d Cir. 1991) ...........................................................43

*Bryan Brothers, Inc. v. Continental Cas. Co.,*
    660 F.3d 827 (4th Cir. 2011) ...........................................................41

*Chicago Ins. Co. v. Paulson & Nace, PLLC,*
    783 F.3d 897 (D.C. Cir. 2015).......................................................40, 41

*Concrete Pipe & Prods. v. Construction Laborers Pension Trust,*
    508 U.S. 602, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993) ............................15

*Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,*
    264 F.3d 302 (3d Cir. 2001) ...........................................................41

*Evergreen Int'l, S.A. v. Norfolk Dredging Co.,*
    531 F.3d 302 (4th Cir. 2008) ...........................................................15

*First Professionals Ins. Co. v. Sutton,*
    607 Fed. Appx. 276 (4th Cir. 2015) ...........................................*passim*

*Fitzgerald v. Manning,*
    679 F.2d 341 (4th Cir. 1982) ...........................................................38

*Gass v. Marriott Hotel Servs.,*
    558 F.3d 419 (6th Cir. 2009) ...........................................................38

*Gaston Memorial Hospital, Inc. v. The Virginia Insurance Reciprocal*,
    80 F. Supp. 2d 549 (W.D.N.C. 1999) ............................................................. 33

*Hook v. Rothstein*,
    316 S.E.2d 690 (S.C. Ct. App. 1984) ........................................................... 39

*Linog v. Yampolsky*,
    656 S.E.2d 355 (S.C. 2008) ........................................................................... 39

*McGill v. Moore*,
    672 S.E.2d 571 (S.C. 2009) ........................................................................... 32

*Med. Protective Co. v. McMillan*,
    2002 U.S. Dist. LEXIS 25672 (W.D. Va. Oct. 29, 2002) ............................. 28

*Navigators Specialty Ins. Co. v. Scarinci & Hollen, LLC*,
    2010 U.S. Dist. LEXIS 47124 (D.N.J. 2010) ............................................... 41

*Roanoke Cement Co., LLC v. Falk Corp.*,
    413 F.3d 431 (4th Cir. 2005) ....................................................................... 15

*Selko v. Homes Ins. Co.*,
    139 F.3d 146 (3d Cir. 1998) ............................................................... 18, 23, 41

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
    618 F.3d 417 (4th Cir. 2010) ................................................................. 14-15

*Westport Ins. Co. v. Albert*,
    2005 U.S. Dist. LEXIS 17477 (D. Md. 2005), *aff'd*,
    208 Fed. Appx. 222 (4th Cir. 2006) ........................................................... 41

## STATEMENT OF THE ISSUES

I.    Did the district court correctly conclude that exclusion 11(c) of the FirstPro policy is applicable, where a reasonable physician under the facts, circumstances and inferences faced by Sutton would have answered "yes" to the disclosure-based questions in FirstPro's policy application?

II.    Did the trial court correctly find that expert testimony was unnecessary to establish reasonable foreseeability, where the facts and inferences in the record allowed the court to determine that issue without expert testimony?

## INTRODUCTION

The current appeal involves factual conclusions by the district court and the application of a clearly stated policy exclusion based on those facts. This process did not require the district court to interpret or construe any ambiguous contract provisions. The court only had to make the factual determinations this Court requested in the previous appeal and then determine whether a specific exclusion applied. Thus, this appeal does not turn on matters of contract interpretation, as Sutton suggests. The critical issue is, instead, whether the record supports the district court's factual conclusions that Sutton, based on an objective reasonableness standard, should have responded "yes" rather than "no" to question 5 of the FirstPro policy application. The facts and inferences in the record are

more than sufficient in that regard, and this Court should affirm the judgment in FirstPro's favor.

## STATEMENT OF THE CASE

A.    Facts of the Underlying Case

On June 22, 2004, Dr. Krysten E. Sutton admitted Amy Moore to St Francis Hospital for induction of labor and delivery of her full-term fetus.  (JA 728.)   The baby, Nathan Moore, was delivered at 6:17 p.m..   He was floppy, blue and unresponsive, and his umbilical cord was wrapped tightly 1½ times around his left ankle.  (JA 269-270, 274.)   Positive pressure ventilation and chest compressions were administered in an attempt to resuscitate him.  After 1 minute and 30 seconds, he still had no respiratory effect.  (JA 271-272.)  His Apgar scores were 1, 2 and 2 at one minute, five minutes and ten minutes respectively – with zero scores for respiration, muscle tone, reflexes and color.  (JA 270-271.)  He was intubated and placed on a ventilator.  (JA 271.)  His first gasp of air did not occur until 18 minutes after delivery, and there was no sustained respiration until 23 minutes after delivery. (JA 271-271.)  In the nursery, Nathan exhibited seizure activity and was transferred to the Neonatal Intensive Care Unit of the Medical University of South Carolina ("MUSC") where he was placed on a ventilator and remained for several weeks with a feeding tube and under the administration of anti-seizure medication.

(JA 282-283.) Nathan was diagnosed with hypoxic ischemic encephalopathy and, ultimately, cerebral palsy. (JA 286-287.)

Sutton's involvement with Nathan ended after his delivery, but she was generally aware of his condition based on information supplied by Amy Moore during her post-partum care. (JA 283-286.) She was aware two weeks after delivery that Nathan remained hospitalized at MUSC, had suffered from neonatal seizures and still required a feeding tube. Although Nathan was improving, his treating neonatologist and neurologist felt his prognosis was "essentially unknown" and they expected him "to have some sort of deficits." (JA 668.) Six weeks after delivery, Sutton was aware Nathan was continued on anti-seizure medication and his doctors were hopeful that he would have little residual effects from the perinatal seizure disorder. (JA 669.) However, Sutton also knew it would take years for adverse effects to develop and become known. (JA 286.) Sutton ultimately learned Nathan had been diagnosed with cerebral palsy. (JA 286.)

B.    The Underlying Lawsuit

On July 22, 2011, Amy and Richard Moore filed a malpractice action on Nathan's behalf against Sutton, her former practice group and St. Francis Hospital. (JA 741-749.) This lawsuit sought damages for Nathan's injuries sustained as a result of alleged deviations from acceptable standards of medical care in

connection with the labor and delivery.[1]  (Id.)  Specifically, the lawsuit requested damages for Nathan's pain and suffering, loss of enjoyment of life, lost earning capacity, permanent impairment, disfigurement and the expenses for medical care, therapies and other related health and attendant care services.  (Id.)

C.     The Records Review Letter

On or about May 23, 2008, Sutton received a letter from a Risk Analyst for St. Francis Hospital ("the Letter").  (JA 670.)  The Letter advised Sutton the hospital had received a request for medical records from an attorney representing Amy Moore related to her labor and delivery on June 22, 2004.  (Id.)  Based upon its risk assessment and review of the requested records, the hospital identified the medical incident as a "potential claim."  (Id.)  As a courtesy, it passed this assessment along to Sutton:

> As part of the ongoing Risk Management activities **to identify potential claims** within our health care system, we conduct routine review of attorney's and patient requests for medical records received at Roper and St. Francis Hospitals.  This is a courtesy notification that an attorney representing the above referenced patient has requested a complete copy of the records referenced above.  (JA 670 (emphasis added).)

---

[1]  With respect to Sutton, the lawsuit alleged that she failed to recognize the non-reassuring labor patterns evidenced by fetal heart monitoring and failed to intervene to perform a timely caesarean delivery.  (JA 745-746.)  This constitutes the "medical incident" for which damages were being sought.

Finding the Letter to be unusual and unlike anything she had seen before, Sutton telephoned MedPro, her then-current malpractice insurer. (JA 255-256.) She reported to MedPro that she had received the Letter and described its contents. (JA 256.) She further provided the patient's name, the date of the treatment and the fact that Moore's attorney had requested the medical records. (JA 256, 670.) She does not recall receiving any further instructions or being requested to provide the names of any additional witnesses or records. (JA 256.) MedPro apparently took no further action after Sutton's call.

When she received notice of the Moores' intent to sue, Sutton advised FirstPro (her malpractice carrier at that time) that she had previously reported the potential claim to MedPro. (JA 251.) After suit was served, Sutton contacted MedPro via email, recounting that she had previously asked about "a potential claim" that she had called about when she "received a letter from a local hospital stating that a patient's medical records had been requested by a lawyer." (JA 258.)

On January 8, 2012, Sutton wrote to request reconsideration of FirstPro's decision to non-renew her malpractice coverage, stating yet again: "I did call MedPro in [2008] when St. Francis Hospital sent me a letter stating that Mrs. Moore's medical records had been requested by a law firm. I do not know what MedPro did with that information, **but I am positive that I reported it to MedPro.** * * * I maintain that I did what was required of me under my agreement

5

with MedPro by notifying them of the records request." (JA 763-764 (emphasis added).)

###### D.    Sutton's FirstPro Policy Application

From 2003 until 2009, Sutton practiced with Carolina Women's Care, P.A. and was continuously insured under a series of MedPro claims-made policies. (JA 248.) In 2009, Sutton changed to a different practice group and sought malpractice insurance from its insurer, FirstPro. (JA 249.) On March 27, 2009, Sutton submitted an application for insurance with FirstPro. (JA 18.) The application inquired about any incidents, while not yet the subject of a suit or claim, that under the circumstances might reasonably lead to a claim or suit being filed in the future. In relevant part, the application asked:

> 5.    Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that any of the following circumstances might reasonably lead to a claim or suit being brought against you, even if you believe claim will not have merit:
>
> a.    A request for records from a patient and or attorney related to an adverse outcome?
>
> *        *        *
>
> 7.    Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that there are outstanding incidents, claims or suits (even if you believe the outstanding claim or suit would be without merit) that have not been reported to your current or prior professional liability carrier? If "yes," please explain. (JA 671.)

6

Sutton responded "No" to both of these questions and did not disclose the Letter from St. Francis Hospital's risk assessment department. (JA 671.) Sutton signed the application, declaring the information provided was "complete and true." (JA 672.) Furthermore, the application, immediately above the signature line and underlined for emphasis, stated that any medical incident, claim or suit reported on the application or occurring before the effective date of coverage "will not be covered by any policy issued to you based upon this application." (JA 672.)

Sutton later claimed she had forgotten about the Letter when she completed the FirstPro application. (JA 331-332.) However, Sutton acknowledged she was trained to view records request letters as indications of potential malpractice claims and if she had remembered the Letter when filling out the FirstPro application, she would have disclosed it. (JA 259, 350.)

E.     The FirstPro Policy

Based on Sutton's application, FirstPro issued Policy No. CL101647, individually insuring her for professional liability. This claims-made policy insured Sutton "for damages because of bodily injury caused by a medical incident[2] which occurs after the retroactive date and prior to the end of the policy"

---

[2]  A "medical incident" is defined by the policy to mean, with respect to Dr. Sutton's individual coverage, "any act, error or omission in the providing of or failure to provide professional services to a patient by you." For purposes of this definition, any bodily injuries caused by the course of treatment of a mother and fetus constitute a single medical incident. (JA 708-709.)

resulting from Sutton's "providing or failure to provide professional services to a patient." (JA 711.) The policy term was April 1, 2011 to April 1, 2012, with an original inception date for Sutton of May 1, 2009. (JA 676.) The policy's retroactive date for Sutton was May 1, 2003. (JA 678.) The policy applied only to "claims[3] first made against an Insured and reported to us in writing during the policy period" and/or to "potential claims[4] reported to us in writing setting forth the circumstance(s) from which an insured knows or could have reasonably foreseen that a claim might be made." (JA 713.)

One of the exclusions in the FirstPro policy stated, in relevant part:

> We will not defend or pay under this coverage part for:
>
> 11.   Any injury or damages:
>
> c.     arising out of a medical incident or committee incident disclosed or **which should have been disclosed on our applications,** renewal applications, or during the application or renewal process. (JA 714-715 (emphasis added).)

---

[3] A "claim" is defined by the policy to mean a lawsuit, a notice of intent to initiate litigation or a demand letter from a lawyer or patient or patient's representative expressing an intent to hold an insured responsible for damages. (JA 708.)

[4] A "potential claim" is defined by the policy to mean "any act(s), error(s), or omission(s) or circumstances(s) which an insured knows or could have reasonably foreseen from the facts, reasonable inferences or circumstances that a claim for a medical incident . . .  might be made, **including but not limited to records requests by an attorney** . . . ." (JA 709 (emphasis added).)

This exclusion ("Exclusion 11(c)") excludes coverage for any medical incident that was either disclosed or which **should have been disclosed** as a potential claim in the application.

F.    The Original Proceedings Below

FirstPro filed this case as a declaratory judgment action in January 2012. FirstPro sought a declaration of no coverage for the Moores' claims based in part on Exclusions 11(a), 11(b) and 11(c). (JA 12-27.) Sutton filed an Answer opposing FirstPro's claim, as well as a Third-Party Complaint against MedPro asserting that company had applicable coverage. (JA 32-36.) The Moores subsequently intervened as defendants with respect to FirstPro's claim. (JA 28-31.)

FirstPro and MedPro both filed motions for summary judgment, which sought rulings of no coverage. After hearing oral arguments, the district court denied those motions on March 6, 2013. (JA 228-241.) The court found it could not grant summary judgment to FirstPro because a factual question existed as to whether or not Sutton had called MedPro in 2008 to notify it of a potential claim. (JA 233.) The district court stated it would need to evaluate the witnesses' credibility to resolve this question and scheduled a bench trial for March 25, 2013. (JA 225, 240.)

At trial, Sutton testified she notified MedPro by phone that she had received the Letter from St. Francis Hospital's risk management office. (JA 256.) She further testified she read the Letter's contents to the MedPro representative who answered the call. (Id.) Those contents included the patient's name, the date of the medical treatment, and an offer for Sutton to review the requested records. (JA 670.) The MedPro representative did not ask Sutton to get those records or to take any other action. (JA 256.) As a result, Sutton believed she had done everything necessary to notify MedPro under the policy's terms. (JA 293.)

The district court also heard live testimony by Joseph Costy, a MedPro claims specialist. Costy testified MedPro had no record of receiving a call from Sutton regarding the Letter. (JA 381-383.) He also explained the procedures MedPro's representatives should have followed upon receiving such a call.[5] (Id.) MedPro argued the existence of those procedures, coupled with the absence of any records, constituted evidence that Sutton did not make the call.

The district court entered its Findings of Fact and Conclusions of Law, as well as a Final Judgment, on May 1, 2013. (JA 769-783.) The court made factual findings that Sutton was credible and that she, in fact, called MedPro and notified the company of the Letter's contents. (JA 773.) The court gave more weight to

---

[5] Significantly, Costy admitted during his testimony that if *he* had received the call and had reviewed the records referenced in the Letter, that information would have "alerted" him of a potential claim involving Amy Moore's child. (JA 419, 434-437.)

Sutton's affirmative testimony than to MedPro's attempt to create a negative inference due to the absence of records. Based on those factual findings, the court concluded Sutton reported a medical incident to another insurer (*i.e.* MedPro) before the effective date of the FirstPro policy, thereby triggering Exclusion 11(b). (JA 782.) The district court did not address the applicability of Exclusions 11(a) or 11(c).[6]

      G.    The First Appeal

The district court's original decision led to cross-appeals. MedPro challenged the finding of coverage under its policy, and Sutton appealed the finding of no coverage under the FirstPro policy.[7] After the parties filed briefs and appeared for oral arguments, this Court affirmed in part and reversed in part. *First Professionals Ins. Co. v. Sutton*, 607 Fed. Appx. 276 (4th Cir. 2015) ("*FirstPro I*").

The Court first affirmed the finding that coverage existed under MedPro's policy. Accepting the district court's credibility-based finding that Sutton called to

---

[6] The district court also concluded that MedPro's policy provided coverage to Dr. Sutton for the Moores' claims. (JA 781.)

[7] During oral argument on the first appeal, counsel conceded that Sutton's cross appeal of the district court's order was a defensive action taken merely to protect Sutton in the event MedPro prevailed on its appeal. However, the current appeal appears to result from arrangements with MedPro as part of its settlement on Sutton's behalf with the Moores. As disclosed by the Moores' counsel on remand, "I have a settlement agreement with MedPro in place that if coverage is found for First Professionals, that any proceeds will be divided between us evenly." (JA 889.) As the court should recognize, Sutton is fully protected from any further exposure regardless of the outcome of this appeal and only FirstPro is at risk.

report the Letter's contents to MedPro, the Court agreed that Sutton satisfied that policy's claim notification requirements. (JA 822.) However, the Court reversed the decision that Exclusion 11(b) of the FirstPro policy was applicable because the Court concluded the information Sutton provided to MedPro was not sufficient to constitute a "report" of a "medical incident" as the FirstPro policy defined those terms. (JA 825-826.)

After stating those conclusions, the Court noted the district court had not addressed the potential applicability of Exclusion 11(c). (JA 826.) Therefore, the Court remanded the case with instructions for the district court to determine:

> whether it was reasonably foreseeable that the St. Francis medical records request letter might reasonably lead to a claim or suit being brought against Dr. Sutton and whether the claim arising from the birth of Nathan Moore was reasonably foreseeable, thereby triggering the exclusion in 11(c). (JA 827.)

H.    Proceedings Below On Remand

FirstPro and Sutton submitted briefs to the district court setting forth their respective positions on the narrow issue this Court identified. Neither party requested permission to submit additional evidence. The court then conducted a hearing on September 22, 2015. After considering the written submissions and oral arguments, the court filed an Order on October 7, 2015, in which it made the following findings: (1) it was reasonably foreseeable that the Letter might reasonably lead to a claim or suit against Sutton, and (2) the claim arising from

12

Nathan Moore's birth was also reasonably foreseeable. (JA 896-910.) Based on those findings, the court concluded Exclusion 11(c) was applicable and precluded any coverage for Sutton with regard to the underlying medical malpractice claim.

## SUMMARY OF ARGUMENT

The district court properly found that Exclusion 11(c) is applicable because Sutton should have disclosed the underlying medical incident involving Amy and/or Nathan Moore on her FirstPro application. Even if Sutton did not recall the details of Nathan's birth, it was **reasonably foreseeable** that the facts, reasonable inferences and circumstances surrounding the Letter **might** lead to a claim or lawsuit being brought against her. Based on the language of the relevant question in the application, Sutton did not need to know the specifics of the potential claim against her for a disclosure to be necessary. She did not even need to know or believe such a claim was likely or meritorious. Disclosure was required as long as a possible claim was reasonably foreseeable based on the totality of the information available to Sutton at the time of the application. Sutton had more than enough facts, reasonable inferences and surrounding circumstances relating to the incident at that time for the possibility of a claim to be reasonably foreseeable and to require disclosure on her application with FirstPro.

Determining the question of reasonable foreseeability in this context did not require the district court to consider any expert testimony. The district court's

13

decision did not depend on the applicable standard of medical care, nor did it rest on specialized knowledge that only a medical doctor would possess. The district court had only to weigh and consider the facts, circumstances and inferences facing Sutton and then decide what was, or should have been, reasonably foreseeable to her. This is exactly the kind of determination that our justice system routinely asks fact-finders to make without any input from experts.

In addition, even if expert testimony had been required, Sutton provided it. Sutton, a licensed and practicing physician, testified about the manner in which she was trained to react and respond to things such as record request letters. Indeed, that training was part of what prompted her to report the Letter to MedPro as soon as she received it. Sutton also testified she probably would have disclosed the Letter on her FirstPro application if she had only remembered it at the time. All this testimony from Sutton supports the district court's findings of reasonable foreseeability.

## ARGUMENT

### I.   Standard of Review

An appellate court "review[s] a judgment resulting from a bench trial 'under a mixed standard of review – factual findings may be reversed only if clearly erroneous, while conclusions of law … are examined de novo.'" *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 427 (4th Cir.

2010) (quoting *Roanoke Cement Co., LLC v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005)).

"[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 623, 113 S. Ct. 2264, 2280, 124 L. Ed. 2d 539, 564 (1993). Furthermore, "when a district court's factual finding in a bench trial is based upon assessments of witness credibility, such finding is deserving of the highest degree of appellate deference." *Evergreen Int'l, S.A. v. Norfolk Dredging Co.*, 531 F.3d 302, 308 (4th Cir. 2008). "The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518, 529 (1985).

## II.   Exclusion 11(c) is applicable because the facts, circumstances and inferences surrounding the Letter made a potential claim by Amy and/or Nathan Moore reasonably foreseeable.

Upon remand, the district court had to answer the following question: When Sutton filled out the application for a FirstPro policy, was it reasonably foreseeable that Amy and/or Nathan Moore might bring a claim or suit against her? Sutton's arguments on appeal attempt to deflect attention from this question, but it remains

the proper focus of the case in its current posture.  If the answer to this question is yes, as the district court concluded, then the applicability of Exclusion 11(c) is beyond any doubt.  Thus, despite Sutton's suggestions to the contrary, this Court need only examine the record to determine whether the evidence supports the district court's answer to this question.  Because ample supporting evidence exists, this Court should affirm the result below.

A.      Exclusion 11(c)

In relevant part, Exclusion 11(c) states that the policy does not cover "[a]ny injury or damages … arising out of a medical incident … disclosed **or which should have been disclosed** on our applications …."  (JA 716 (emphasis added).) There is no dispute that Sutton failed to disclose anything about the labor and delivery of Amy Moore or the birth of Nathan Moore on her FirstPro application. As a result, the inquiry in this case is whether Sutton **should have** made such a disclosure.   To determine what Sutton "should have" disclosed, the specific language of the relevant portions of the application questionnaire must be considered.[8]

---

[8]   Sutton obviously had not seen the policy when she completed the application. Thus, it is the language of the application questions – not the wording of Exclusion 11(c) itself – that determines whether she should have disclosed the Letter on the application.

B.    FirstPro Application

Question 5 of the FirstPro application asked, in relevant part:

> Do you know or is it **reasonably foreseeable** from the facts, reasonable inferences or circumstances that any of the following circumstances **might** reasonably lead to a claim or suit being brought against you, even if you believe claim will not have merit:
>
> a.    A request for records from a patient and or attorney related to an adverse outcome?

(JA 671 (emphasis added).)  Question 7 of the FirstPro application asked:

> Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that there are outstanding incidents, claims or suits (even if you believe the outstanding claim or suit would be without merit) that have not been reported to your current or prior professional liability carrier?  If "yes," please explain. (JA 671.)

As their plain language demonstrates, these questions did not require Sutton to know or provide specific details about a potential claim or suit.  The questions merely sought to determine the **existence** of potential claims that might be reasonably foreseen from the circumstances surrounding the Letter.

In addition, the questions were not restricted to potential claims of which Sutton had actual knowledge.  The questions required Sutton to disclose all reasonably foreseeable potential claims or suits that **might** arise from one or more of a list of specified circumstances.  One such circumstance, of course, was "[a] request for records from a patient and or attorney related to an adverse outcome."

17

(JA 671.) This is where the central question arises: When Sutton completed the application, should she reasonably have known of a potential claim or suit arising from the Letter? To answer this question, the district court properly turned to the facts and reasonable inferences available to Sutton at that time.

C.     The record supports the district court's finding that a potential claim was reasonably foreseeable to Sutton when she completed the FirstPro application.

The questions in FirstPro's application, incorporated by Exclusion 11(c), create both a subjective standard and an objective standard for determining the potential claims that must be disclosed. Such a two-part subjective/objective test does not permit an insured to "stick her head in the sand" and forget matters that were within her actual knowledge prior to the inception of the policy. *Selko v. Homes Ins. Co.*, 139 F.3d 146 (3d Cir. 1998). "That an insured denies recognizing [a reasonable basis to believe a claim might arise] on grounds of ignorance of the law, oversight, psychological difficulties, or other personal reasons is immaterial." *Id.* at 152. Under the proper inquiry, the court first asks the subjective question of whether the insured knew certain facts and then asks the objective question of whether those facts reasonably could have been expected to give rise to a claim. *American Special Risk Mgmt. Corp. v. Cahow*, 192 P.3d 614 (Kan. 2008). The prior knowledge exclusion is premised upon the insured's knowledge of objective facts known at any time prior to the inception of the policy, without regard to

18

whether the insured properly appreciates those facts or even remembers them. Thus, the district court properly addressed the information available to Sutton prior to the inception of the policy, not what she later claimed to have forgotten. That information was more than sufficient to make a claim reasonably foreseeable.

On or shortly after May 23, 2008, less than a year before completing the FirstPro application, Sutton received the Letter from a risk analyst for St. Francis Hospital's Risk Management department. (JA 670.) The Letter informed her that an attorney representing her patient Amy Moore had requested a **complete set** of records related to Moore's labor and delivery on June 22, 2004. (Id.) Based upon the hospital's risk assessment and review of the records request, the hospital identified it as a "potential claim" and, as a courtesy, passed this information along to Sutton. (Id.) The Letter advised Sutton that the medical records and request were being kept by the Medical Records Department and were available for her review. She was invited to view these records and to contact the Risk Analyst.

Sutton did nothing to take advantage of this opportunity to review the records or speak to the Risk Analyst. However, she felt the letter was so "unusual" that she was duty bound to report it to her then-professional liability insurer, MedPro. (JA 256.) Sutton testified she had never received a letter like this before, but had been taught since residency that she should always report medical records requests by attorneys under such circumstances. (JA 259, 266-67, 350.) She was

sufficiently moved by the Letter to call MedPro immediately and to read it to them over the phone.[9]

In addition, Sutton knew, or reasonably should have known, the circumstances of Nathan's birth.[10]  Sutton rated his delivery as being in the bottom handful of those she had performed.  (JA 273-274.)  At birth, Nathan was floppy, blue and unresponsive.  (JA 269-270, 274.)  His umbilical cord was wrapped tightly 1½ times around his left ankle.  (JA 269-270.)  The amniotic fluid was stained with light, thick meconium.  (JA 270, 661, 663.)  Positive pressure ventilation and chest compressions were administered to resuscitate him. (JA 271.)  After 1 minute and 30 seconds, he still had no respiratory effect. (JA 272-272.)  His Apgar scores were 1, 2 and 2 at one minute, five minutes and ten minutes respectively – with zero scores for respiration, muscle tone, reflexes and color. (JA 27-271.) He was intubated and placed on a ventilator. (JA 282-283.) His first gasp of air occurred 18 minutes after delivery. (JA 271-272.) Sustained respiration did

---

[9]    Sutton's testimony demonstrates that another attorney record's request was reported to FirstPro prior to her receipt of the St. Francis letter.  Her office manager at her prior practice immediately reported it as a potential claim.  (JA 262-264.)  While Sutton suggested that the action taken was by her nurse/office manager, not herself, this action evidences that a reasonable health care professional views records requests by attorneys under circumstances involving poor outcomes to be a potential claim to be reported to the insurer.

[10]    Indeed, most of the cited information regarding Nathan's condition is derived from Sutton's own notes regarding the labor and delivery, her office notes and/or from the hospital records she had reviewed and signed at the time of the delivery.

not occur until 23 minutes after delivery. (Id.) In the nursery, Nathan exhibited seizure activity and was transferred to the neonatal intensive care unit at MUSC where he was placed on a ventilator and remained there for several weeks with a feeding tube and under administration of anti-seizure medication. (JA 282-283, 665.)

Sutton knew shortly after the birth that Nathan's neonatologist and neurologist had a guarded prognosis and they expected him to have some sort of deficits, hopefully mild. (JA 283, 286.) Sutton later learned Nathan was diagnosed with hypoxic ischemic encephalopathy. (JA 286-287.) While Sutton testified that she believed Nathan's condition to be a "transient adjustment to life and he would be fine," she neither sought nor obtained further information about his condition. She also knew it would take years for the adverse effects of Nathan's conditions to develop and become apparent. (JA 286.)

Even if Sutton began to forget some of this information in the years following the delivery, it was all available to her in the records the St. Francis Risk Management department pulled in response to the attorney request. Although Sutton declined the opportunity to review those records, the information contained in them remains relevant under an objective standard that examines not what she actually knew, but what she reasonably should have known.

21

Sutton's experience and area of practice were also important factors to consider when evaluating reasonable foreseeability. As the district court noted (without contradiction from Sutton's counsel), OB-GYNs face a disproportionately high share of malpractice claims due to the potential for severe and permanent conditions arising from complications during prenatal care and childbirth. Sutton handles a high volume of obstetrical cases and has personally delivered "a couple of thousand" babies. (JA 272.) Nathan's condition at birth was atypical and fell within the bottom handful of all deliveries she experienced. (JA 273-75.) The acknowledged risk of liability makes OB-GYNs particularly mindful of potential claims.

These facts and circumstances, which Sutton knew prior to completing the FirstPro application, lead to the conclusion that a potential claim based on Nathan's birth was reasonably foreseeable. At the very least, the Letter and the circumstances of the birth create a reasonable inference that a potential claim or suit "might" be filed. The Letter notified Sutton of a request by an attorney for a specific set of records that, if they had been reviewed or the events recalled, would have reminded Sutton of a delivery that involved significant complications. The Letter was unlike anything Sutton had seen before, and it motivated her to report it promptly to her professional liability carrier. Therefore, Sutton cannot credibly

argue under those circumstances that a potential claim was not reasonably foreseeable.

That Sutton did not recall these additional facts, or even the Letter, when she completed her application simply makes no difference in applying the objective prong of the analysis. This is so because it is the totality of the insured's knowledge that is proven in the subjective analysis – not simply what she claims to have remembered. This is why the insured's actual knowledge, if proven, is to be considered in the test's objective prong. It suffices that these facts were actually known to her prior to the application and the inception of the FirstPro policy. As observed in *Selko*, imbuing a reasonable professional with the information actually known to the insured and assessing whether that reasonable professional would foresee a claim, does no injustice to an insured. The professional "is not made accountable for matters he did not know about, nor for known matters that would not cause a reasonable [professional] to foresee a claim." *Selko*, 139 F.3d at 152. But an insured cannot escape facts within his or her knowledge that furnish a reasonable basis to believe a circumstance could develop into a claim. It is unreasonable to tie FirstPro's exclusion to "lapses of memory" as that would improperly reward an insured's "subjective understanding" and encourage "disingenuous, after-the-fact justifications" for discounting or ignoring the known facts. *See Selko*, 139 F.3d at 152.

23

Significantly, this Court has already concluded that the Letter made an eventual claim for damages against Sutton reasonably foreseeable. In *FirstPro I*, the Court affirmed the district court's finding that, by reading the Letter to a MedPro representative over the phone, Sutton reported a potential claim to MedPro. As the Court explained:

> [T]he proper inquiry is whether a <u>reasonable person</u> in Dr. Sutton's shoes would have believed that the May 2008 letter from St. Francis Hospital described an incident that would result in a claim for damages. **Because a reasonable doctor could view a letter from a hospital's risk management department relaying a medical records request as a first step in the patient's decision to initiate litigation, the evidence here supports a finding that there could exist a reasonable belief that the incident would result in a claim for damages**.

(JA 803-804 (underline in original, boldface added).) Thus, there can no longer be any doubt that an objectively reasonable physician would view the Letter "as a first step in a patient's decision to initiate litigation" and that it should have been reported to FirstPro as well.

Sutton's position on this issue is difficult to square with her own admitted reaction to receiving the Letter. Sutton thought the Letter was so unusual it warranted a prompt call to her professional liability insurer. This creates a reasonable inference that Sutton viewed the Letter as something that might develop into a claim or suit against her. Why else would she place her liability carrier on

notice of it? This inference further supports the district court's conclusion that regardless of whether this potential claim was actually on Sutton's "radar" when she completed the FirstPro application, it reasonably should have been. In fact, this is exactly the type of information Question 5(a) is designed to solicit.

Indeed, Sutton's current argument contradicts her position from earlier in this action. In her claim against MedPro, Sutton relied exclusively on the telephone call to MedPro to show she satisfied the requirements of reporting a potential claim under the terms of MedPro's policy. By taking that position, Sutton necessarily attributed more significance to the Letter than she now cares to admit. She found the letter to be "unusual" and took it seriously enough to call MedPro immediately and notify it of the Letter's contents. Now, however, Sutton attempts to dismiss the Letter as an odd, but ultimately harmless, piece of correspondence that she quickly put out of her mind. Sutton cannot have it both ways. Having previously argued, with success, that the Letter was sufficiently important to trigger coverage under MedPro's policy,[11] Sutton should not be heard to diminish the Letter's significance for purposes of FirstPro's policy.

---

[11] Even though MedPro disputed the existence of Sutton's telephone reporting of the potential claim, its adjuster testified that had he known about the St. Francis Letter, coupled only with the condition of the child at birth, he would have immediately set it up as an incident triggering coverage under MedPro's policy. (JA 418-19, 435-37.)

D.   <u>The district court properly concluded that Exclusion 11(c) is applicable.</u>

Having found a potential claim was reasonably foreseeable to Sutton based on the Letter and the attendant circumstances, the district court correctly applied Exclusion 11(c) of FirstPro's policy.  This decision did not require the court to interpret or construe the language of the exclusion, which is clear.  The court only had to apply its factual findings on reasonable foreseeability to that plainly stated exclusion.

Sutton's failure to disclose the underlying potential claim on her FirstPro application triggers Exclusion 11(c).[12]  As the district court recognized, Exclusion 11(c) serves a different purpose than Exclusions 11(a) and 11(b).  (JA 876, 878, 883.)  Exclusion 11(a) is a "general catchall," requiring disclosure of any potential claims known to the insured at the time of the application that have not yet come to fruition.  Exclusion 11(b) focuses on medical incidents that have been reported to another insurer.  Exclusion 11(c) relates to potential claims in existence at the time of the insured's application for a policy, of which the applicant either knows or

---

[12]   The policy's definition of "potential claim" is, in relevant part, "any act(s), error(s) or omission(s) which an **insured** knows or could have reasonably foreseen from the facts, reasonable inferences or circumstances that a **claim** for a **medical incident** or **committee incident** might be made, including but not limited to records requests by an attorney …." (JA 709 (emphasis in original).)  This Court has previously concluded that Sutton sufficiently reported a potential claim to MedPro for purposes of its notification requirements.  Thus, there can be no doubt that the Letter should have made Sutton aware of a potential claim when she completed her FirstPro application.

reasonably should foresee. The exclusion makes it clear that FirstPro will not provide coverage for any such claims, which the applicant is required to list on the application form. This is why the exclusion focuses on what the insured listed, or failed to list, on the policy application.

Exclusion 11(c) states that FirstPro will not defend or pay for any injury or damages "arising out of a medical incident … disclosed or which should have been disclosed on our applications, renewal applications, or during the application or renewal process." (JA 714-715.) As discussed above, question 5(a) of the application asked whether Sutton knew or could reasonably foresee that a records request from a patient and/or attorney might lead to a claim or suit against her. Question 7 asked whether she was aware of any outstanding incidents, claims or suits that have not been reported to her current or prior professional liability carrier. Dr. Sutton answered "no" to both questions. She did not disclose the potential issues with Amy Moore's delivery and Nathan's birth as either a reported or unreported claim. Her failure to do so makes Exclusion 11(c) applicable.

Sutton testified she simply forgot about the Letter after she reported it to her professional liability carrier.[13] Even if that is true, it does not alter the result because the questions on the application, which Exclusion 11(c) incorporates, create both a subjective and an objective standard. Thus, the district court's

---

[13] Nevertheless, Sutton admitted she would likely have disclosed the Letter on her FirstPro application if she had remembered it at that time.

finding that the Letter and its attendant circumstances made a potential claim reasonably foreseeable was sufficient to trigger Exclusion 11(c), regardless of what Sutton did or did not remember.

Sutton offers only cursory arguments against the district court's findings of reasonable foreseeability arising from the Letter. She attempts to shift the focus away from that well-supported finding by arguing the district court ignored the term "medical incident" that appears in Exclusion 11(c).[14] No such analysis was necessary, however, because the term "medical incident" does not have the significance in this context that the Court determined it had for the issue on

---

[14]    Sutton cites *Med. Protective Co. v. McMillan*, 2002 U.S. Dist. LEXIS 25672 (W.D. Va. October 29, 2002) to support its argument that the term "medical incident" should somehow alter the result in this case. Reliance on *McMillan* is, however, misplaced. The *McMillan* exclusion at issue was similar to Exclusion 11(b), not Exclusion 11(c), which was triggered by the reporting of "claims" to a prior insurer. It had no application to "potential claims." Second, the *McMillan* communication was determined to be a routine attorney record request with no attendant circumstances suggesting it might be the harbinger of a future claim. In sharp contrast to *McMillan*, here the St. Francis Letter communicated much, much more. While the Letter certainly disclosed that an attorney records request had been received, the significant portion of the communication (ignored by Sutton) was the hospital's risk assessment review identifying the underlying medical incident as a potential claim. Finally, in *McMillan* the court determined the prior insurer properly dismissed the attorney's records request as a routine record request and nothing more. Here, even Sutton recognized this as something other than a routine records request and led to her reporting the Letter to MedPro. MedPro, although claiming not to have received Sutton's communication, ultimately conceded that had the Letter been received, it would have immediately recognized its import as signaling a potential claim.

Exclusion 11(b) raised in *FirstPro I*. In fact, an interpretation of the term "medical incident" is not at all necessary in the present appeal to trigger Exclusion 11(c).

*FirstPro I* involved the "narrow" legal issue of whether Sutton making the contents of the Letter known to a representative of her liability carrier constituted a "report" of a "medical incident." This Court concluded Sutton "reported" the Letter to the carrier representative, but that the Letter in and of itself did not qualify as a "medical incident."[15] In reaching that decision, the Court narrowly focused on the Letter's actual contents because that was the only information Sutton communicated to MedPro.

In the present appeal, the definition of "medical incident" is not the determining factor, or even a relevant one, and there was no need for the district court to consider that term in the manner Sutton urges. Exclusion 11(c) incorporates the questions about potential claims found in the application. For purposes of Exclusion 11(c), it is assumed that there are claims against an insured for injury or damages arising from a "medical incident."[16] Otherwise there would

---

[15] The FirstPro policy's definition of "medical incident" is, in relevant part, "any act, error or omission in the providing of or failure to provide **professional services** to a patient by **you** or by persons described in the Individual Professional Liability Coverage Part for whom **you** are determined to be legally responsible." (JA 708 (emphasis in original).)

[16] Clearly, the Moores' claims for damages against Sutton arose from a "medical incident." If they did not, Sutton would have no basis to request coverage in the first place.

29

be nothing to exclude.  The real question for this exclusion is whether the potential

claim that arose from the medical incident was, or should have been, disclosed to

FirstPro during the application process.  To address that issue, it is necessary to

examine the relevant application questions.[17]

Question 5 of the application asks, in relevant part:

> Do you know or is it reasonably foreseeable from the facts, reasonable inferences or circumstances that any of the following circumstances might reasonably lead to a claim or suit being brought against you, even if you believe claim will not have merit:
>
> a.    A request for records from a patient, patient's representative or attorney related to an adverse outcome?

(JA 671.)  This question does not request specific information about the potential

claim.   It merely asks if the applicant knows of any actual or reasonably

foreseeable claims existing at the time of the application.  The only options for

answering this question are boxes to check either "YES" or "NO."  (Id.)

The limited nature of question 5 demonstrates the difference between the

issue in this appeal and the one in *FirstPro I*.  In the previous appeal, this Court

examined the **substance** of the communication to the MedPro representative.  The

details of what Sutton did or did not communicate to that representative were

---

[17]  While Sutton claims the district court ignored the language of the exclusion to focus on the application questions, she does the exact opposite.  Sutton devotes an entire section of her brief to the term "medical incident," but she pays almost no attention to the questions on the application, which lie at the heart of this appeal.

determinative because the question was whether what Sutton reported qualified as a "medical incident." The issue is different in the current appeal. Question 5 does not use the term "medical incident" and does not ask for any details about the potential claims. Thus, there is no way – and no need – to examine whether the details are sufficiently specific to constitute a "medical incident." All that matters is whether Sutton knew about **or reasonably should have foreseen** any potential claims against her. Stated differently, *FirstPro I* involved the substance of what Sutton actually reported to MedPro, whereas the present appeal addresses whether a general disclosure to FirstPro was warranted. This is a critical distinction.

In addition, the existence of an objective standard under question 5 is important because it incorporates the kinds of specifics this Court contemplated for a "medical incident" in *FirstPro I*. Although Sutton reported only the language of the Letter to the MedPro representative,[18] she was, or reasonably should have been, aware of other "facts, reasonable inferences [and] circumstances" raised by the Letter when she answered question 5 in the FirstPro application. Had Sutton reviewed the requested records to refresh her memory, as the hospital's risk management department invited her to do, she would have known exactly what medical services she provided, and she could have evaluated the errors she might

---

[18]  Again, the inquiry in *FirstPro I* was limited to the four corners of the Letter because that was the only thing Sutton reported to MedPro. The same limitation does not exist in the context of question 5.

be alleged to have made.  Sutton did not take advantage of that opportunity, but that failure does not affect the analysis under an objective standard.  Furthermore, Sutton acknowledged that Nathan's birth was near the bottom in terms of all deliveries she has performed in her career and that complications from the birth were possible.  (JA 273-274.)  Thus, the facts and inferences raised by the Letter, along with the information readily available to her, made a potential claim from her treatment of Amy/Nathan Moore reasonably foreseeable.  Indeed, this was the basis of the district court's conclusions.

Although Sutton focuses solely on the term "medical incident," the district court properly examined the language of Exclusion 11(c) as a whole.  *See generally McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009) ("A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause.").  The exclusion eliminates coverage for "[a]ny injury or damages … arising out of a medical incident … <u>disclosed or which should have been disclosed on our applications</u> …."  (JA 716 (emphasis added).)  Read as a whole, this exclusion focuses on whether or not something was disclosed or should have been disclosed on the policy application.  As previously noted, this focus necessarily incorporates, and requires an examination of, the application questions.  Thus, the district court correctly used the language of question 5, including its objective standard, to determine that Exclusion 11(c) is applicable.

Shifting to the language of the application, Sutton also claims the district court erred by not emphasizing a phrase found in question 5. One of the specific circumstances listed in that question is "[a] request for records from a patient, patient's representative or attorney related to an adverse outcome." (JA 671.) Sutton argues the court failed to consider the last phrase ("related to an adverse outcome") in reaching its decision. Contrary to that assertion, the record demonstrates the court **did** take that phrase into consideration. (JA 906.) But even if the court had not specifically discussed the phrase, Sutton's arguments would still fail for several reasons.

First, the Letter in this case was clearly "related to an adverse outcome," as Nathan Moore suffers from medical problems that are allegedly related to his delivery. [19] Thus, the request for hospital records by the Moores' attorney arose from an adverse result. Sutton might not have specifically remembered the bad outcome when she received the Letter, but she delivered Nathan and had

---

[19]    In an analogous factual situation, infants born with unexpected perinatal asphyxia and Apgar scores less than 6 requiring transfer to a neonatal facility within 72 hours after birth have been recognized as an "adverse outcome" qualifying as a reporting circumstance. *See Gaston Memorial Hospital, Inc. v. The Virginia Insurance Reciprocal*, 80 F. Supp. 2d 549, 555 (W.D.N.C. 1999) ("The 'specific circumstances' of the Walden birth – cord asphyxia and the presence of meconium in the amniotic fluid, followed by the infant's transfer to the Charlotte Memorial Hospital NICU – were well documented in the medical records * * * ; combined with the receipt of a number of attorneys' requests for medical records, these circumstances would lead a reasonable person in [the insured's] position to believe that the litigation of some sort might ensue.").

previously been aware of potential complications from that birth.[20] St. Francis Hospital recognized the records request and attendant circumstances as a harbinger of a potential claim. Joe Costy of MedPro certainly recognized the Letter as a potential claim. Sutton found the Letter sufficiently worrisome as to immediately report it to MedPro. Sutton admitted that had she recalled the Letter and Nathan's condition at the time she completed the application, she would have reported it in response to question 5. That prior knowledge was sufficient to make it reasonably foreseeable to Sutton that the Letter related to an adverse outcome.

Second, the Letter itself gave indications that it related to an outcome that was at least allegedly adverse. The Letter came from the hospital's risk management department, which evaluates and addresses actual and potential claims against the hospital and its medical professionals. The Letter further stated that risk management was sending it as part of an effort to identify "potential claims" within the hospital system. A letter from the risk management department that referenced "potential claims" and notified Sutton about an attorney's record request was sufficient to alert her that it could reasonably relate to an adverse patient outcome.

---

[20] This brief has previously identified the facts and circumstances about the birth and resulting problems that were within Sutton's knowledge. For the sake of space, FirstPro will not repeat that discussion here.

Third, Sutton's position would excuse doctors from reporting on their applications all but the most detailed record request letters. Sutton implies that in order for a record request letter to fall within question 5(a)'s scope, it must not only list the patient and the relevant dates, but also specifically state that the records are being requested due to a bad result the patient experienced. Assuming attorneys **ever** put that kind in detail in a record request letter, such examples would be very few and far between. For all practical purposes, therefore, Sutton's reading of question 5(a) would render it meaningless by eliminating the vast majority of record request letters. Under Sutton's theory, only letters expressly stating the attorney's motives for the request would fall within question 5(a)'s scope.

Fourth, Sutton's argument relieves physicians from any responsibility to investigate, even in the most cursory fashion, the information contained in a record request letter. Under Sutton's position, a physician would not need to review the requested records or make any inquiry prior to omitting that letter from a response to question 5(a). No duty to disclose would arise unless the letter stated that the records being requested were related to an unfavorable outcome for the patient. Such a standard would allow potential insureds to turn a blind eye to most record request letters simply because they did not contain some version of a "magic

phrase." This is neither a proper interpretation of Rule 5(a)'s disclosure requirement, nor a fair one.

For these reasons, Sutton's reliance on the phrase "related to an adverse outcome" does not establish any basis for reversal. The district court properly interpreted and applied Exclusion 11(c) and question 5(a) as a whole, and its decision should be affirmed.

Sutton also misses the mark with her suggestion that the district court's application of Exclusion 11(c) would require physicians to disclose every single record request by an attorney on their policy applications. This argument overlooks question 5's reasonable foreseeability standard. The FirstPro application does not ask applicants to disclose every records request they have ever received or known about. Question 5 seeks only disclosure of record requests that, based on the surrounding facts and circumstances, could reasonably indicate a claim or suit might ensue. This narrowly tailored inquiry appropriately serves Exclusion 11(c)'s function, which is to exclude coverage for potential claims in existence at the time of the application. It does not have the sweeping scope Sutton suggests, and the language clearly would not apply to the types of innocuous records requests Sutton posits in her brief.

Although Sutton now attempts to downplay the Letter's significance, it alarmed her enough to prompt an immediate phone call to her malpractice liability

carrier. As this Court has already determined, that phone call constituted a report of a potential claim to MedPro.[21] Sutton also had a duty to disclose that potential claim to FirstPro in response to question 5 of the application, regardless of what she did or did not recall about the Letter at that time. By not disclosing the Letter, and the potential claim it represented, Sutton triggered Exclusion 11(c). FirstPro would not have covered that potential claim had Sutton properly disclosed it, and her failure to do so when the claim was reasonably foreseeable should not create unintended coverage. Preventing that outcome is the clear function and purpose of Exclusion 11(c), which the district court properly applied. Therefore, this Court should affirm the decision below.

## III. The district court correctly concluded that no expert testimony was necessary to establish objective reasonableness in this context.

The district court concluded it did not need expert testimony as to whether a potential claim would be reasonably foreseeable to a physician in Sutton's position at the time of the application. As explained in the Order:

> The Court finds that, as a fact finder, it does not require an expert to testify to something that is perfectly obvious from a review of the Risk Management letter. When a "risk analyst" for a hospital's Risk Management Department" sends an "unusual" letter to a physician about an attorney's request for medical records as part of its efforts "to identify potential claims in our health care system," the Court, sitting as a fact finder, does not need

---

[21]   The MedPro policy defines a "potential claim" as "an incident which the Insured reasonably believes will result in a claim for damages."

> a physician to offer an expert opinion that this records
> request "might" lead to a suit or claim.

(JA 905.)  The district court committed no error in reaching this conclusion, and

the absence of expert testimony does not provide any basis for reversal.  *See*

*Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982); *Gass v. Marriott Hotel*

*Servs.*, 558 F.3d 419, 430 (6th Cir. 2009).

As a threshold matter, Sutton's argument contradicts this Court's analysis in

*FirstPro I*.  This Court applied an objective standard to the question of whether

Sutton reported a potential claim to MedPro: "the proper inquiry is whether a

reasonable person in Dr. Sutton's shoes would have believed that the May 2008

letter from St. Francis Hospital described an incident that would result in a claim

for damages."  (JA 803-804 (emphasis in original).)  After citing authorities

regarding a "reasonable belief" standard, this Court concluded:

> Because a reasonable doctor could view a letter from a
> hospital's risk management department, relaying a
> medical records request as a first step in a patient's
> decision to initiate litigation, **the evidence here supports
> a finding that there could exist a reasonable belief
> that the incident would result in a claim for damages.
> Therefore, the district court did not err in
> determining that Dr. Sutton (even contrary to her
> own subjective state of mind) reported a potential
> claim under the terms of the [MedPro] policy.**  (JA
> 804 (boldface emphasis added).)

As this passage demonstrates, this Court did not require any expert

testimony to establish a reasonable belief on the part of a physician in Sutton's

situation. This Court affirmed the district court's finding of reasonable belief, even though it never cited any expert testimony or even hinted that such testimony could be necessary. Matters of common sense remain matters of common sense. Clearly, then, expert testimony is unnecessary in this context.[22] Otherwise the Court could not possibly have decided that issue in *FirstPro I* the way that it did.

The current appeal presents the Court with a similar question[23] based on the same record evidence. Because that evidence, without expert testimony, has already been deemed sufficient to support a finding of reasonable belief, it is unclear why more would now be required to show reasonable foreseeability. The situations are functionally identical. Indeed, the only thing that has changed from *FirstPro I* is Sutton's motivation. When a finding of reasonable belief was in her personal interest (i.e. to obtain coverage under the MedPro policy), Sutton made no

---

[22]  Sutton improperly relies on *Hook v. Rothstein*, 316 S.E.2d 690 (S.C. Ct. App. 1984) as support for her contention that expert testimony is required in every case to establish what a reasonable physician would have foreseen or believed. *Hook* stands for no such proposition. *Hook* involved a medical malpractice claim for allegedly failing to obtain the patient's informed consent. At issue was whether the physician had provided sufficient information to enable the patient to make an intelligent and informed decision. *Hook* merely held that lack of informed consent cases fall *within the medical malpractice framework* and require claimants to establish by expert testimony the doctor's deviation from the accepted medical standard of care. *Hook* does not impose any expert testimony requirement outside this setting. In fact, the South Carolina Supreme Court has expressly limited *Hook*'s holding to the medical malpractice setting, and *Hook* has no application to this case. *See Linog v. Yampolsky*, 656 S.E.2d 355, 358 (S.C. 2008).

[23]  *FirstPro I* involved a question of "reasonable belief" and the present appeal involves the question of "reasonable foreseeability."

mention of an expert testimony requirement and never attempt to present any to the district court. But now that a finding of reasonable foreseeability invokes a FirstPro policy exclusion, Sutton believes expert testimony is required. Sutton's abrupt change of position goes against this Court's previous analysis in *FirstPro I*, and this fact alone should defeat Sutton's argument.[24]

Even if the Court had not already decided this issue in the previous appeal, the end result would be the same because the case law does not support Sutton's position. Courts have regularly decided issues of reasonable foreseeability in the context of prior knowledge exclusions in professional liability policies without considering expert testimony. For example, in a recent case the District of Columbia Circuit affirmed a district court's decision that a reasonable attorney in the insured attorney's position would have foreseen the filing of a malpractice claim. *Chicago Ins. Co. v. Paulson & Nace, PLLC*, 783 F.3d 897 (D.C. Cir. 2015). The Court rejected the insured's argument that expert testimony was required to establish reasonable foreseeability, noting:

> Appellants do not cite any cases holding that expert testimony if necessary to determine when a law firm should have known to notify its professional liability

---

[24] It makes no difference that Sutton was trying to establish coverage, whereas FirstPro claims an exclusion. Either expert testimony is required in this context to show reasonable belief/reasonable foreseeability or it is not, regardless of the party making the argument. This Court has already affirmed a finding of reasonable belief in the absence of any expert testimony, and the same result should apply to the district court's finding of reasonable foreseeability.

> insurer of a possible claim, and we have not found any
> such cases.  To the contrary, there are many cases in
> which no such testimony has been required.

*Id.* at 902 (citations omitted).  Other courts have also evaluated the application of similar exclusions in professional liability policies without requiring or considering expert testimony.  *See*, *e.g.*, *Bryan Brothers, Inc. v. Continental Cas. Co.*, 660 F.3d 827 (4th Cir. 2011); *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302 (3d Cir. 2001); *Selko v. Homes Ins. Co.*, 139 F.3d 146 (3d Cir. 1998); *Navigators Specialty Ins. Co. v. Scarinci & Hollen, LLC*, 2010 U.S. Dist. LEXIS 47124 (D.N.J. 2010); *Westport Ins. Co. v. Albert*, 2005 U.S. Dist. LEXIS 17477 (D. Md. 2005), *aff'd*, 208 Fed. Appx. 222 (4th Cir. 2006).   Therefore, the district court did not need expert testimony to decide the question on remand.

In addition, even if one assumes for the sake of this argument that expert testimony was required, any error would be harmless because Sutton conceded she would have disclosed the Letter on the application had she recalled it at the time. The following exchange took place during Sutton's cross-examination at the bench trial:

> Q:    … If you had known that this was a record request
> related to Amy Moore and you had a recollection of Amy
> Moore and that the result was, at least in terms of the
> baby, were in that handful of cases, that top one percent
> or bottom one percent of results with those APGAR
> scores, with the complications that the baby had, would
> you have answered that question any differently?

A:    Again, I didn't know all of that.  So I want to make sure that's clear.

Q:    Well, would you – you had it out of your mind, okay?  If you had remembered those things that you knew at one time?

A:    Sir, I didn't know that this – that the record about Amy Moore, that request in 2008 was even the same.

THE COURT:[25]    Dr. Sutton, let me help you.  You've testified – we understand what your testimony is about not remembering.  He's asking to assume hypothetically you knew the facts in the underlying medical record and you remembered them, and you remembered the St. Francis letter, in those circumstances would you have disclosed it on the [FirstPro] application?

THE WITNESS:  I would say yes.  I mean, today I have been doing everything way more cautiously.

(JA 350:19-351:16.)  Regardless of how Sutton now attempts to characterize this testimony, it was plainly an admission that she would have answered question 5(a) differently if she had remembered the Letter and the facts surrounding the patient it referenced.

Sutton now points to earlier testimony in which she denied she would have answered question 5(a) differently.[26]  The problem with Sutton's argument is that it

---

[25]    Sutton appears to hint, without directly making the argument, that the district court should not have posed this question to Sutton.  However, the record does not contain any contemporaneous objection by Sutton to the question, and the plain error rule would not apply in this context.

[26]    The passage Sutton cites appears on pages 331-332 of the Joint Appendix.

42

does not erase the testimony quoted above.  The district court properly considered her testimony as a whole, including both her denial and the later admission.  Sitting as the fact finder, the district court had the ability to evaluate Sutton's entire testimony and accept all of it, some of it, or none at all.  *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 179 (3d Cir. 1991) ("The district court, not this Court, finds facts and assesses credibility. Like any factfinder, it can accept some parts of a party's evidence and reject others.").  The district court obviously credited the admission and rejected the self-serving denial.  This was well within the district court's discretion as the fact finder in a bench trial.

The district court did not need expert testimony to conclude that a reasonable physician under the facts, circumstances and inferences faced by Sutton, could have reasonably foreseen that the Letter might lead to a claim.  The record provides more than enough to support the district court's findings without expert testimony, and Sutton still has not cited any binding authority that requires such testimony in this context.  Therefore, this issues does not provide any basis for reversal.

## **CONCLUSION**

Based on the arguments and authorities set forth above, this Court should affirm the district court's decision granting judgment in FirstPro's favor based on Exclusion 11(c) of FirstPro's policy.

/s/ Thomas C. Salane
Thomas C. Salane
R. Hawthorne Barrett
Turner, Padget, Graham & Laney, P.A.
P.O. Box 1473
Columbia, SC 29202
(803) 254-2200
TSalane@TurnerPadget.com
TBarrett@TurnerPadget.com

Attorneys for the Appellee First
Professionals Insurance Company

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,810*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[      ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>March 7, 2016</u>            <u>/s/ Thomas C. Salane</u>
                                                        *Counsel for Appellee*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 7th day of March, 2016, I caused this Brief of

Appellee to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Oana D. Johnson                          George J. Kefalos
JANIK, LLP                               GEORGE J. KEFALOS, PA
1 Carriage Lane, Building H              46 A State Street
Charleston, South Carolina  29407        Charleston, South Carolina  29401
(843) 410-1912                           (843) 722-6612

*Counsel for Appellant*                    *Counsel for Appellant*

I further certify that on this 7th day of March, 2016, I caused the required

copies of the Brief of Appellee to be hand filed with the Clerk of the Court.

/s/ Thomas C. Salane
*Counsel for Appellee*